## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BELINDA TIBBITTS, as Personal
Representative of the Estate of Martin J.
Tibbitts,

      Plaintiff/Counter-Defendant,

v.

GREAT NORTHERN INSURANCE
COMPANY, an Indiana corporation,

      Defendant/Counter-Plaintiff.

Case No.: 2:20-cv-10029-TGB-RSW

Hon. Terrence G. Berg
Magistrate Judge R. Steven Whalen

---

## PLAINTIFF BELINDA TIBBITTS'
## RESPONSE TO DEFENDANT GREAT NORTHERN
## INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

ISSUES PRESENTED............................................................................... iv

CONTROLLING OR MOST APPROPRIATE AUTHORITIES............................ v

COUNTER-STATEMENT OF MATERIAL FACTS ............................................ 1

INTRODUCTION ...................................................................................... 6

STANDARD OF REVIEW ......................................................................... 7

ARGUMENT ........................................................................................... 7

   I.  A fair reading of the Aircraft Exclusion permits coverage because the aircraft was chartered with a professional crew. ............................................. 8

   II.  Great Northern waived the Aircraft Racing Exclusion. ............................... 13

   III.A fair reading of the Aircraft Racing Exclusion permits coverage. .............. 19

       1.  "Competitive" ............................................................................. 20

       2.  "Stunting" .................................................................................. 22

CONCLUSION ........................................................................................ 24

i

# TABLE OF AUTHORITIES

## Cases

*Allstate Vehicle & Prop. Ins. Co. v. Todaro*, 443 F. Supp. 3d 801 (E.D. Mich. 2020) ............................................................................................................7

*American Nat. Fire Ins. Co. v. Rose Acre Farms, Inc.,* 107 F.3d 451 (1997).........10

*Bartlett Invs. Inc. v. Certain Underwriters at Lloyd's London,*, 319 Mich. App. 54 (2017)...........................................................................................................15

*Brotman v. Roelofs*, 70 Mich. App. 719 (1976)..................................................18

*Butts v. Union Cent. Life Ins. Co.*, 266 F. Supp. 739 (M.D. Tenn. 1967) ..............12

*Casey v. Auto Owners Ins. Co.*, 273 Mich. App. 388 (2006) .................................18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................7

*Farm Bureau Mut. Ins. Co. v. Nikkel*, 460 Mich. 558 (1999)..................................7

*Farm Bureau Mut. Ins. Co. v. Stark*, 180 Mich. App. 55 (1989) .............................8

*InterRoyal Corp. v. Sponseller*, 889 F.2d 108 (6th Cir. 1989) .................................7

*Kirschner v. Process Design Assocs.*, 459 Mich. 587 (1999)..................................18

*Lee v. Evergreen Regency Coop. & Mgmt. Sys., Inc.*, 151 Mich. App. 281 (1986)18

*Matthews v. Ranger Ins. Co.*, 281 So.2d 345 (Fla. 1973)........................................10

*Mich. Twp. Participating Plan v. Fed. Ins. Co.*, 233 Mich. App. 422 (1999).........14

*Miner v. Western Casualty & Surety Co.*, 241 Iowa 530 (1950)............................11

*N. River Ins. Co. v. Kay-R Elec. Corp.*, 187 A.D.2d 961 (N.Y. App. Div. 4th Dept. 1992) ........................................................................................................10

*N.Y. Life Ins. Co. v. Jones*, 224 F.2d 33 (5th Cir. 1955).........................................12

*Norton v. Warner Co.*, 321 U.S. 565 (1944)...........................................................10

*O'Connor v. Oakhurst Dairy*, 851 F.3d 69 (1st Cir. 2017) ....................................21

*Ruddock v. Detroit Life Ins Co*, 209 Mich. 638 (1920) .............................. 16, 17, 18

*Sanborn v. Income Guaranty Co.*, 244 Mich. 99 (1928) .................................. 17, 18

*Smit v. Kaechele*, 207 Mich. App. 674 (1994)........................................................18

*Smith v. Grange Mut. Fire Ins. Co.*, 234 Mich. 119 (1926) ....................................19

*South Macomb Disposal Auth. v. American Ins. Co.*, 225 Mich. App. 635 (1997) ..9

*Surratt v. Unum Life Ins. Co. of Am.*, No. 11-2943, 2013 U.S. Dist. LEXIS 123866 (E.D. La. Aug. 29, 2013) ......................................................................................22

*Toohey v. Wyndham Worldwide Corp. Health & Welfare Plan*, 727 F. Supp. 2d 978 (D. Or. 2010) ...............................................................................................12

*United Rentals Highway Techs., Inc. v. Ind. Constructors, Inc.*, No. 1:05-cv-0571-SEB-VSS, 2006 U.S. Dist. LEXIS 85411 (S.D. Ind. Nov. 22, 2006)..................21

*Vanderlann v. Educators Mutual Insurance Company*, 356 Mich. 318 (1959) ......11

**Statutes**

54 Fed. Reg. 34284, 34308 (Aug. 18, 1989) ...........................................................23

## ISSUES PRESENTED

I.      Whether Defendant was obligated to defend and indemnify Plaintiff, but denied any obligation to do so.

        Defendant answers: No.
        Plaintiff answers: Yes.


II.     Whether Defendant knowingly waived the ability to assert the Aircraft Racing Exclusion when it knew of its obligation to explain its reasons for denying coverage, reviewed all necessary information, and chose to repeatedly assert only one basis for denial of coverage.

        Defendant answers: No.
        Plaintiff answers: Yes.


III.    Whether the Aircraft Racing Exclusion relieves Defendant of its obligation to defend and indemnify Plaintiff.

        Defendant answers: Yes.
        Plaintiff answers: No.

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Sanborn v. Income Guaranty Co*, 244 Mich. 99 (1928)

*Farm Bureau Mut. Ins. Co. v. Nikkel*, 460 Mich. 558 (1999)

*N. River Ins. Co. v. Kay-R Elec. Corp.*, 187 A.D.2d 961 (N.Y. App. Div. 4th Dept.

1992)

## COUNTER-STATEMENT OF MATERIAL FACTS

1.      Admitted.

2.      Admitted that the Policy contains the exclusions referred to in ¶¶ 3 and 4. Denied that the exclusion in ¶ 4 is relevant.

3.      Admitted that the policy contains the quoted language.

4.      Admitted that the policy contains the quoted language. Denied that the "Watercraft and aircraft racing or track usage" exclusion is applicable.

5.      Admitted that the policy contains the same exclusions; denied that they are both applicable.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     Denied. In order to fly a WHAM airplane, WHAM had to give Tibbitts permission to fly the plane. Proctor Dep., ECF No. 30-2, at 134:6-14.

13.     Admitted that Mr. Proctor testified to Tibbitts doing "eleven hours of ground differences training" and an "orientation ride" during that time frame.

1

Denied that Mr. Proctor testified that these activities were in preparation for any specific destination or event.

14.    Admitted that Mr. Proctor testified to his belief that EAA AirVenture is the biggest air show in the world. Plaintiff does not contest that AirVenture is an event that includes the largest civilian airshow in the world.

15.    Admitted that the website so stated. Plaintiff does not contest the information.

16.    Admitted.

17.    Admitted.

18.    Admitted.

19.    Denied insofar as "the purposes of their activities" is vague. Mr. Proctor also testified that Mr. Tibbitts, Mr. McNeil, and himself "went [to Sheboygan] because it was a jet blast. It was a formation clinic, so we go to formation clinics all over the country. So the fact that it was adjacent to Oshkosh does not necessarily mean that we wouldn't have been in Sheboygan if it weren't for Oshkosh. I'm trying to explain that properly." Proctor Dep., ECF No. 30-2, at 153:23-154:5; 138:5-25 ("Q. So it's not necessarily the case that he was only flying that day for the Oshkosh Air Show. A. Correct.").

20.    Admitted.

21.    Admitted.

22.     Admitted that Mr. Proctor testified that Mr. McNeil, Mr. Tibbitts, and himself gathered in Sheboygan, Wisconsin as part of the Classic Jet Aircraft Association's formation flight exercise. *Id.* at 135:15-17; 38:1-3.

23.     Admitted that Defendant quoted the testimony accurately. But Mr. Proctor also testified that Mr. Tibbitts was "flying a WHAM airplane conducting a formation exercise to build proficiency in the aircraft." *Id.* at 138:5-8.

24.     Admitted that the affidavit is cited accurately.

25.     Admitted that the affidavit is cited accurately.

26.     Admitted that Glaser occupied the seat next to Mr. Armstrong in the Provost jet. Denied that the formation flight was solely intended to assist Mr. Tibbitts in his preparation for AirVenture. Mr. Proctor himself testified that "it's not necessarily the case that he was only flying that day for the Oshkosh Air Show." *Id.* at 138:5-25.

27.     Admitted that Mr. Glaser's affidavit states that he briefed the formation flight in accordance with the standards of the Formation and Safety Team.

28.     Admitted that Mr. Glaser's affidavit is cited accurately.

29.     Admitted that the affidavits are cited accurately.

30.     Admitted that the affidavits are cited accurately.

31.     Admitted that the affidavit is cited accurately.

32. – 41.    Admitted.

42.    Admitted that the letter so states. The letter also included the following omitted paragraph:

> **<u>Coverage</u>**
>
> It is the position of Chubb that the damages claimed would meet the definitions of **Personal Injury** and/or **Property Damage**. The damages were a result of the vintage plane crash thus excluded from coverage by the *Aircraft* exclusions.
>
> The Masterpiece excess policy has the same definitions and exclusions as the primary policy. Because Chubb has already advised you that no coverage exists for this claim under policy 1350150401, Chubb advises that no coverage exits under the excess policy (#1350150402).

43.    Admitted that the letter so states. Great Northern omitted the following language that was included in the letter:

> **<u>Coverage</u>**
>
> It is the position of Chubb that the allegations in the Complaint appear to trigger the definitions of **Personal Injury** as the plaintiffs are seeking compensation for bodily injury. Unfortunately, the damages were a result of the vintage plane crash, thus excluded from coverage by the *Aircraft* exclusion.
>
> The Masterpiece excess policy has the same definitions and exclusions as the primary policy. Because Chubb has already advised you that no coverage exists for this claim under policy 1350150401, Chubb advises that no coverage exits under the excess policy (#1350150402) for the same reasons.

44.    Admitted.

4

45.     Admitted that the letter so states, but denied that the following omitted sentence is irrelevant: "Please note that the forgoing declination of coverage is based upon the allegations in the Complaints, the information provided by you and upon the terms and conditions of the Great Northern policies referenced in this letter."

46.     Admitted.

47.     Admitted that Great Northern filed an Answer and Counterclaim on January 28, 2020. Denied that this constituted an "update" to its coverage position.

48.      Admitted.

49.     Admitted that Great Northern filed its First Amended Counterclaim on June 1, 2020 and in it declined defense and indemnity based on the two mentioned exclusions. Denied that this filing served as a reservation of rights.

## INTRODUCTION

This case arises out of Great Northern's denial of coverage. Great Northern's motion for summary judgment rests on two arguments. First, it argues that the phrase "chartered with a professional crew" in the Aircraft Exclusion is unambiguous and the exclusion using it prevents coverage. Second, Mr. Tibbitts' final flight was in preparation for a "stunting" event, and thus excluded from coverage under the Aircraft Racing Exclusion. Both of these arguments fail. The Aircraft exclusion is not applicable because the exception to the exclusion applies (Mr. Tibbitts chartered the aircraft with a professional crew). Great Northern itself has already proved that the chartering language is ambiguous. In denying coverage it defined "charter" to mean to "reserve for private use." In its motion for summary judgment, it defined charter as to "hire, rent, or lease for use." Great Northern cannot stick to one definition. Under Great Northern's prior definition, there is coverage, and when two reasonable interpretations point in different direction, the policy must be construed in favor of the insured.

As for the other argument, Great Northern waived the Aircraft Racing Exclusion when it repeatedly and consciously chose (on three separate occasions) to not assert it despite having all the necessary facts before it. Regardless, that exclusion does not apply. Great Northern is not entitled to summary judgment; to the contrary, judgment should be entered in favor of the Estate.

## STANDARD OF REVIEW

Summary judgment is appropriate where the record demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The movant bears burden to show, through evidence, the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that showing is made, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 110 (6th Cir. 1989).

## ARGUMENT

Under Michigan law, courts interpret insurance policies according to their plain terms, but a "contract is said to be ambiguous when its words may reasonably be understood in different ways." *Farm Bureau Mut. Ins. Co. v. Nikkel*, 460 Mich. 558, 566 (1999). "If a fair reading…leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous and should be construed against its drafter and in favor of coverage." *Id.* "This protects the policyholder from confusing and overly technical language." *Allstate Vehicle & Prop. Ins. Co. v. Todaro*, 443 F. Supp. 3d 801, 809 (E.D. Mich. 2020). "In particular, exclusionary clauses in insurance policies are to be strictly

construed against the insurer." *Farm Bureau Mut. Ins. Co. v. Stark*, 180 Mich. App. 55, 58 (1989).

The Aircraft and Aircraft Racing Exclusions that Great Northern relies upon are ambiguous. A fair reading of these exclusions suggests coverage in favor of the Estate, contrary to Great Northern's interpretations. Because of this ambiguity, the Policies must be interpreted in favor of coverage.

## I.  A fair reading of the Aircraft Exclusion permits coverage because the aircraft was chartered with a professional crew.

The Aircraft Exclusion has three parts: (1) a "non-owned aircraft," (2) "chartered with a professional crew," (3) "by you or on your behalf." Great Northern disputes only whether the aircraft was "chartered with a professional crew." Although in its denial letters it somehow contended that the aircraft "may not be a non-owned aircraft to Mr. Tibbitts," ECF No. 29-17, PageID.125, Great Northern now admits, as it must, "that WHAM owned the Venom" and "with respect to Mr. Tibbitts, the Venom was a 'non-owned' aircraft." ECF No. 29, PageID.924.

Great Northern argues that the Venom was not chartered by Tibbitts or on his behalf because "'Charter' means 'to hire, rent, or lease for use, exclusive and temporary use' or 'of relating to or being a travel arrangement in which transportation (as a bus or plane) is hired by and for one specific group of people.'" *Id.* at 925 (quoting Merriam Webster's Collegiate Dictionary, 11th ed.). That is

not, however, the definition it used when it denied coverage on October 10, 2018, June 26, 2019, or on August 21, 2019. ECF Nos. 30-7, 30-8, 30-10. After sending two letters that made no attempt to explain why the Venom could not possibly be "chartered," Great Northern finally defined "charter" to mean "the reservation of an aircraft, boat or bus for private use." Letter of April 21, 2019, ECF No. 29-17. Thus, even Great Northern recognizes that the term is susceptible to more than one meaning. "Ambiguity exists when a policy provision is reasonably susceptible to more than one meaning." *South Macomb Disposal Auth. v. American Ins. Co.*, 225 Mich. App. 635, 658 (1997).

Great Northern ignores its prior definition, finding another one that better suits its current argument: chartering requires that a vessel be "hired, rented, or leased." ECF No. 29, PageID.925. However, none of those is a requirement under Great Northern's prior definition. Nowhere in the policy did Great Northern state that the aircraft had to be "hired, rented, or leased." And the facts support coverage under the prior definition—i.e., that that the Venom was reserved by Tibbitts or on his behalf for his private use. WHAM authorized Tibbitts to use the Venom. Proctor Dep., ECF No. 30-2, at 134:3-14 ("Q. WHAM gave him permission to fly the plane on July 20th of 2018, correct? A. Correct."). Tibbitts flew the plane for the first time a week or so before the incident. *Id.*, 128:25-129:16. At the time of the crash, Tibbitts used the Venom "to build proficiency in the aircraft." *Id.*, 138:5-

8. The aircraft was reserved and provided to Tibbitts for his private use—exactly what "chartered" means, according to Great Northern.

Notably, courts construing similar chartering provisions have concluded they were ambiguous. For instance, a New York court also confronted a claim involving a small, single-engine aircraft in *N. River Ins. Co. v. Kay-R Elec. Corp.*, 187 A.D.2d 961 (N.Y. App. Div. 4th Dept. 1992). The court held that "the phrase 'chartered with crew' in North River's policy exclusion is ambiguous and is susceptible to more than one reasonable interpretation." *Id.* at 961; *see also American Nat. Fire Ins. Co. v. Rose Acre Farms, Inc.,* 107 F.3d 451 (1997) (finding the phrase, "if such aircraft is owned or hired without pilot or crew by or on behalf of the 'Insured,'" ambiguous).

The Policy language does not require hiring, paying, or leasing. It does not require that money changed hands. It simply uses the term "chartered" and Great Northern itself defined that to mean "reserved for private use." Under that interpretation, Tibbitts' use of the Venom qualifies.

Tibbitts also qualified as a "professional crew." Numerous cases have recognized that a crew can consist of only one person. *See, e.g.*, *Norton v. Warner Co.*, 321 U.S. 565, 571-72 (1944); *Matthews v. Ranger Ins. Co.*, 281 So.2d 345, 348 (Fla. 1973) (defining "crew" to mean "any person involved in the operation of the aircraft while in flight"); *Miner v. Western Casualty & Surety Co.*, 241 Iowa

530 (1950) ("[O]ne man can constitute a crew."). The Venom is a single-seat aircraft that can accommodate only one person—the pilot—making whoever that pilot may be the "crew" of the aircraft. *See Vanderlann v. Educators Mutual Insurance Company*, 356 Mich. 318, 326 (1959) (if the insured was "operating the plane" then he was "serving as a member of the crew").

As for Tibbitts being "professional," a professional is one who has an "assured competence in a particular field or occupation." American Heritage Dictionary 562 (Paperback ed. 1981). Across the United States, Tibbitts was one of five people qualified to fly the Venom. Proctor Dep., ECF No. 30-2, at 141:8-18. It is illegal for a pilot who has not received the proper type rating to fly this specific aircraft. *Id*. at 131:24-132:8. Tibbitts was among an exceedingly narrow class of people trained and licensed to fly the Venom. He was a "professional" for the purpose of operating the aircraft.

Great Northern's argument to the contrary is consigned to a footnote that recites definitions but does little to explain why they cannot apply here. ECF No. 29, PageID.924. Again, these definitions never emerged before now. When Great Northern denied the claim, it was because Great Northern surmised that "Mr. Tibbits (sic) was not a professional crew that would have been hired by himself or on his behalf." Email of August 16, 2019, ECF No. 30-16; Feine Dep., ECF No. 30-13, at 177:4-15.

11

The Policy has no requirement that the crew be "hired," it need only be "professional." Tellingly, subsequent versions of Chubb Masterpiece policies *do* include language in the Aircraft Exclusion requiring that the crew be paid. *See* G & M, Masterpiece Policy Wording 46, https://www.gnm.com.sg/wp-content/uploads/2021/04/Masterpiece-Policy.pdf ("We do not cover any damages arising out of the ownership, possession or use of any aircraft. But We do cover damages arising out of the use of an aircraft charter by You **with paid crew**, not owned by You or any entity in which You have an ownership interest or leasehold interest.") (emphasis added).

Furthermore, the Policy does not bar the crew from including the insured, even though many other policies explicitly do so. *See id.* (excluding coverage when an aircraft is "in the care, custody or control of a covered person"); *Toohey v. Wyndham Worldwide Corp. Health & Welfare Plan*, 727 F. Supp. 2d 978, 984 (D. Or. 2010) (exclusion when aircraft is "being flown by the Covered person or in which the Covered Person is a member of the crew"); *Butts v. Union Cent. Life Ins. Co.*, 266 F. Supp. 739, 740 (M.D. Tenn. 1967) (exclusion for "[t]ravel or flight in any kind of aircraft while the insured is a pilot, officer or member of the crew of such aircraft"); *N.Y. Life Ins. Co. v. Jones*, 224 F.2d 33, 35 (5th Cir. 1955) (exclusion when insured "is a pilot, officer or other member of the crew of such aircraft").

12

What matters is whether a fair reading of the provision, drafted by the insurer, can include Tibbitts. It can. Consequently, the Policy must be interpreted in favor of coverage.

## II. Great Northern waived the Aircraft Racing Exclusion.

Great Northern chose to deny coverage—not once, not twice, but three times. By the time it issued its last denial letter (August 21, 2019), it knew everything it needed to assert the Aircraft Racing Exclusion. By then, it had the Complaints in the underlying lawsuits. The complaints alleged that Mr. Tibbitts was flying in preparation for the EAA Oshkosh AirVenture air show. *See* ECF No. 29-11, ¶ 17 (alleging that Tibbitts transported the Venom "to Sheboygan Falls, Wisconsin, for the purposes of participating in the annual Oshkosh vintage aircraft formation flying clinic"). Before issuing its final denial letter, Great Northern's claim adjuster (Rochelle Feine), claim supervisor (Michael Majewski), and Vice President of Claims (Brian Doyle) all had an opportunity to review and assert any and all exclusions to coverage that they felt were applicable. At no point did Great Northern ever contend that it lacked any information or cooperation from the insured. At the time it denied coverage, Great Northern had everything available to it to deny coverage on the basis of the Aircraft Racing Exclusion, but it chose—for whatever reason—not to do so. It raised the exclusion for the first time in its answer to the complaint filed in this action.

13

Upon tender of the claim for defense and indemnity, Great Northern had five options: (1) unconditionally accept the tender, (2) accept the tender under a reservation of rights, (3) accept the tender under a reservation of rights, but file a declaratory judgment action, (4) decline the tender and file a declaratory judgment action, or (5) decline and do nothing. It chose option number five—decline and do nothing.

Denials or reservation of rights are intended to notify the insured of potential coverage issues and avoid surprises. Reservations to assert additional defenses are intended to permit an insurer to raise new defenses that later arise, not raise defenses that may have existed at inception of the claim like in this case. Great Northern could have accepted the tender of defense under a reservation of rights and conducted an investigation later denying coverage. Instead, it chose to deny coverage and chose to do so solely on the basis of the Aircraft Exclusion. A denial of coverage (particularly, in the context of its duty to defend) limits the insurer from raising additional new defenses. *See, e.g.*, *Mich. Twp. Participating Plan v. Fed. Ins. Co.*, 233 Mich. App. 422, 435-36 (1999) ("Generally, once an insurance company has denied coverage to its insured and stated its defenses, the insurer has waived or is estopped from raising new defenses.")*; Durham v. Auto Club Group Ins. Co.*, No. 329667, 2016 Mich. App. LEXIS 2282 (Ct. App. Dec. 13, 2016) (**Exhibit 1**) (holding that when an insured was denied coverage after a full

investigation that provided the insurance company with "knowledge of all necessary facts to assert" a "residency defense," yet the insurance company failed to assert such a defense in its first letter denying coverage, the defense was waived).

Great Northern argues that it did not waive the ability to assert the Aircraft Racing exclusion because (1) it incorporated the entire Policy "by reference" in its denial letters, and (2) Michigan law does not recognize waiver where it broadens coverage. ECF No. 29, PageID.929-930. The first point has been soundly rejected by Michigan courts. The second point is not as absolute as Great Northern contends.

 Each of Great Northern's letters included some version of the incantation, "We reserve the right to assert additional reasons to disclaim coverage based upon the policies' terms and conditions or additional facts, whether now known or discovered in the future." ECF No. 29-14, PageID.1240. Michigan courts have repeatedly held that such "general reservation-of-rights language" is "not sufficient to comply with an insurer's notice obligations." *Bartlett Invs. Inc. v. Certain Underwriters at Lloyd's London*, 319 Mich. App. 54, 61-62 (2017). "Such general language smacks of bad faith for want of specific reference to that clause of the policy on which the insurer intended to rely." *Id.* If insurers could rely on boilerplate language then insurers "would be able to issue overly broad and vague

denial letters without giving their insureds any indication of which provisions in the policy they ultimately intend to rely on in denying coverage." *Id.*

The idea that Great Northern did not knowingly fail to assert *the only other exclusion about aircraft* is particularly hard to swallow given its current position. Great Northern's argument is that Tibbitts was "practicing flying in formation in preparation for AirVenture," and flying in formation is necessarily a "stunting" activity. ECF No. 29, PageID.928. Even if true (and it is not), all of this could have been gleaned from the complaints in the underlying lawsuits or the most basic investigation. *See* ECF No. 29-11, ¶ 17 (alleging that Tibbitts transported the Venom "to Sheboygan Falls, Wisconsin, for the purposes of participating in the annual Oshkosh vintage aircraft formation flying clinic"). Even now, Great Northern's evidence about the event is derived from its publicly available website. Great Northern knowingly chose to not assert the exclusion, thereby waiving it.

Great Northern's argument that its waiver cannot be used to broaden the coverage is mistaken. The cases it cites all ultimately rely on *Ruddock v. Detroit Life Ins Co*, 209 Mich. 638 (1920). There, decedent had a life insurance policy that excluded coverage for death from service in war. *Id.* at 649. When he died in military service, his estate filed a claim and the insurance company cooperated in processing it. But when the insurance company later learned of the full

circumstances of his death, it denied coverage. The Supreme Court recognized that there was no waiver by the insurance company.

Eight years after *Ruddock*, however, the Supreme Court held that an insurance company did waive a basis for denial, and under facts much more similar to those here. In *Sanborn v. Income Guaranty Co*, 244 Mich 99 (1928), the decedent's insurance policy permitted coverage only from an accidental injury, which "totally and continuously disabled him" until his death, and only if he was tended to by a physician. When the estate's attorney wrote to the insurance company arguing why there was coverage, the insurance company replied, "after full consideration of all the facts obtained to date, [we are] not satisfied that death was due to accidental injury," and denied the claim on that basis. *Id.* at 103. It was later proven that decedent was not totally disabled by the accident and was not tended to by a physician. *Id.* Nevertheless, the circuit court held that the insurance company waived "waived any defense it might have had on the ground that the deceased was not totally and continuously disabled from the time of the accident or that he was not regularly attended by a physician," and the Supreme Court affirmed:

> Under the decisions of this court, the circuit judge was correct in holding as a matter of law that because of this letter written by the defendant to the plaintiff's attorney, the only defense available to the insurance company was that the death of Mr. Sanborn was not due to an accidental injury.

*Id.* at 103-104.

Great Northern cites *Smit v. Kaechele*, 207 Mich. App. 674 (1994) for the so-called rule from *Ruddock*. But the court in *Smit* expressly recognized that "[t]he limitation on the application of waiver and estoppel discussed in *Ruddock* has not been applied without exception," and cited *Sanborn*. 207 Mich. App. at 680. Five years later, the Michigan Supreme Court reemphasized, "in some instances, courts have applied the doctrines to bring within coverage risks not covered by the policy." *Kirschner v. Process Design Assocs.*, 459 Mich. 587, 596 (1999).

One such exception must occur when, as here, an insurer has every relevant fact before it, but consciously declines to assert an exclusion. Michigan courts do not recognize bad-faith denial as a cause of action against insurers because insurance contracts are treated like other contracts, and a "plaintiff cannot maintain an action in tort for nonperformance of a contract." *Casey v. Auto Owners Ins. Co.*, 273 Mich. App. 388, 401 (2006). It is well-established that a party to a contract may waive the enforcement of a provision included for its benefit. *Brotman v. Roelofs*, 70 Mich. App. 719, 726 (1976). Applying waiver to an insurer that makes a knowing choice based on full access to the facts does not run afoul of the concern that a "company should not be required by waiver and estoppel to pay a loss for which it charged no premium." *Lee v. Evergreen Regency Coop. & Mgmt. Sys., Inc.*, 151 Mich. App. 281, 285-86 (1986). Great Northern willingly chose to not

assert additional exclusions, despite having every relevant fact at its disposal. It waived the other exclusions.

If Great Northern is permitted to assert new exclusions even though it had every relevant fact its disposal when it thrice denied coverage, then there is no real reason for Great Northern—or any insurer—to raise applicable exclusions in any denial letter. An insurance company will always be able to raise a new exclusion later—even though it had full knowledge of the untimely raised exclusion when it originally denied coverage. The idea, however, is to provide fair notice to the insured of possible policy defenses especially where the insurance company knows of available defense at the time it denies a claim. *Smith v. Grange Mut. Fire Ins. Co.*, 234 Mich. 119, 122-23 (1926) ("good faith requires that the [insurance] company shall fully apprise the insured of all of the defenses it intends to rely upon, and its failure to do so is, in legal effect, a waiver, and estops it from maintaining any defenses to an action on the policy other than those of which it has thus given notice.").

## III.    A fair reading of the Aircraft Racing Exclusion permits coverage.

Great Northern assumes that "the Estate will concede that this [the Aircraft Racing] exclusion precludes coverage here—again, it must under the undisputed facts . . . ." ECF No. 29, PageID.929. Great Northern's assumption is wrong: the

Estate does not concede that the exclusion applies and the undisputed facts suggest that it does not.

The exclusion that Great Northern refers to as the "Track Usage Exclusion" provides:

> **Watercraft and aircraft racing or track usage.** We do not cover any damages arising out of the ownership, maintenance or use of any watercraft or aircraft during any instruction, practice, preparation for, or participation in, any competitive, prearranged or organized racing, speed contest, rally, sports event, stunting activity or timed event of any kind. This exclusion does not apply to sailboat racing even if the sailboat is equipped with an auxiliary motor.

ECF No. 29-2, PageID.1018. Great Northern argues that Tibbitts was preparing and practicing for the AirVenture event at the time of his death and thus concludes that the exclusion applies. Not so. The event is not the type of event described in the exclusion and Tibbitts was flying the Venom—days before the event—to build proficiency in the aircraft, which he regularly did entirely apart from that or any other event.

### 1. "Competitive"

To begin with, the exclusion applies only to "competitive" events, and Great Northern has presented no evidence that the AirVenture event was competitive in any way. That is because it was not.

Great Northern ignores the "competitive" requirement, focusing only on the terms "prearranged" and "organized," but that is not how the exclusion is written.

A comma separates "competitive" and "prearranged" but not "prearranged or organized." "Competitive" and "prearranged or organized" are therefore two qualifiers for the list that follows them. In other words, the exclusion applies only if the event is competitive, is prearranged or organized, and is one of the listed types of events (speed contest, rally, etc.).

Great Northern's ignoring of the "competitive" qualifier might make sense if the Policy included an additional comma after "prearranged": "any competitive, prearranged, or organized racing, speed contest, rally. . . ." But there is no comma there, and its omission cannot be considered merely stylistic when it affects the meaning of the provision at issue. Courts have regularly concluded that a provision is ambiguous solely based on the absence of a serial comma. *See, e.g.*, *O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 70 (1st Cir. 2017) ("For want of a comma, we have this case."); *United Rentals Highway Techs., Inc. v. Ind. Constructors, Inc.*, No. 1:05-cv-0571-SEB-VSS, 2006 U.S. Dist. LEXIS 85411, at *46 (S.D. Ind. Nov. 22, 2006) (**Exhibit 2**) ("This grammatical nitpicking is not merely pedantic - indeed, it is key to rendering a proper interpretation of the agreement.").

Moreover, if the omission of a comma after "prearranged" was merely stylistic, one would expect that style to be consistent throughout the sentence, and it is not:

> We do not cover any damages arising out of the ownership,
> maintenance or use of any watercraft or aircraft during any

21

> *instruction, practice, preparation for, or participation in*, any
> competitive, prearranged or organized racing, speed contest, rally,
> sports event, stunting activity or timed event of any kind.

*Cf. Surratt v. Unum Life Ins. Co. of Am.*, No. 11-2943, 2013 U.S. Dist. LEXIS 123866, at *18-19 (E.D. La. Aug. 29, 2013) (**Exhibit 3**) ("Unum expressly used the serial comma in a preceding sentence, even though doing so was not necessary to avoid confusion . . . . Thus, under Unum's reading, the drafter chose to insert the serial comma where it was not necessary, but then, just two sentences later, chose both to omit it while simultaneously choosing to confuse policy readers by using two coordinating conjunctions.").

The exclusion applies only when an event is competitive. AirVenture was not competitive and Great Northern has presented no proof to that it was. It was— and is—simply an airshow that allows aircraft enthusiasts to view all types of aircraft. No reasonable person would seriously contend that the North American International Auto Show is a competitive event. The exclusion does not apply for that reason alone. To the extent that the exclusion is ambiguous as to the "competitive" requirement, it must be construed in favor of coverage.

### 2. "Stunting"

Great Northern argues that Tibbitts "was involved in a 'rally,' 'sports event,' and 'stunting activity'" but discusses only stunting activity. According to Great Northern, the reason for Tibbitts' flight was "formation training," and "flying in

formation is a difficult feat requiring great skill and should be characterized as a 'stunting' activity." ECF No. 29, PageID.928.

Stunting is not so broad. Nearly every maneuver of a plane requires great skill; that is why flying is comprehensively regulated and stratified by ratings for particular aircraft and the nature of the flight. If "stunting" included every maneuver for which the pilot had to "practice a lot," Proctor Dep., ECF No. 30-2, at 47:13, then every flight would qualify as a stunt. But "stunting" or "stunt flying" is more specific. "Stunt flying as a generic term may include barnstorming[], crazy flying (the performance of comedic aerial routines), or any spectacular or unusual flying feat . . . ." Carson, A. J., "Stunt flying." Encyclopedia Britannica, June 22, 2018. https://www.britannica.com/topic/stunt-flying. For more than 100 years, "stunt" flying has meant maneuvers out of the ordinary, such as "flying upside down, rolling, and performing the most loops (either normal loops or outside loops)." *Id.*

The FAA uses the term "aerobatic flight" rather than "stunting," and defines it as "an intentional maneuver involving an abrupt change in an aircraft's attitude, an abnormal attitude, or abnormal acceleration, not necessary for normal flight." 54 Fed. Reg. 34284, 34308 (Aug. 18, 1989). The definition has nothing to do with the proximity of one plan to another, which is the only detail that Great Northern relies upon in calling Tibbitt's last flight a "stunt."

Tibbitts was flying to build proficiency in the Venom. Proctor Dep., ECF No. 30-2, at 128:10-17. Tibbitts did not even get into formation at the time of his accident. The formation exercise was something Tibbitts "would do without the air show being impending." *Id.* at 47:19-25. Neither Tibbitts' final flight nor his planned involvement at AirVenture involved "stunts" of any kind. The exclusion does not apply.

## CONCLUSION

The test in this case is simple: if a fair reading of policy language would permit coverage, the policy must be interpreted in favor of the insured. A fair reading of the Estate's Policy permits coverage and Great Northern's attempt to backtrack on its definitions only underscores the ambiguity of the language. The Aircraft Racing Exclusion is inapplicable on its face, but even if it were not, Great Northern consciously chose (on three separate occasions) to not assert it, fully aware of all necessary facts, and thereby waived it. Great Northern's motion must be denied, and the Estate's motion granted instead.

Respectfully submitted,

BODMAN PLC

*/s/Michael G. Costello*
Michael G. Costello (P38008)
Stephen P. Dunn (P68711)
Donovan S. Asmar (P77951)
201 W. Big Beaver Road, Suite 500
Troy, MI 48084
(248) 743-6000
sdunn@bodmanlaw.com
mcostello@bodmanlaw.com
dasmar@bodmanlaw.com
*Attorneys for Plaintiff*

October 29, 2021

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on October 29, 2021, I electronically filed the foregoing papers by using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

*/s/ Michael G. Costello*
Michael G. Costello

Bodman_18031633_8